Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

STEPHANIE ENYART,                  )
                                   )
            Plaintiff,             )
                                   )
   VS.                             )  No. C 09-5191 CRB
                                   )
NATIONAL CONFERENCE OF BAR         )
EXAMINERS, INC.,                   )
                                   )  San Francisco, California
            Defendant.             )  Tuesday
_____)  October 11, 2011


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:


**For Plaintiff**:          DISABILITY RIGHTS ADVOCATES
                            2001 Center Street, Fourth Floor
                            Berkeley, CA 94704
                    **BY:  ANNA RACHEL LEVINE, ESQUIRE**

                            **SCOTT CHARLES LABARRE, ESQUIRE**
                            1660 S. Albion, Suite 918
                            Denver, Colorado 80222

**For Defendant**:          Cooley Godward
                            Five Palo Alto Square, Fourth Floor
                            Palo Alto California 94306-2155
                    **BY:  GREGORY CLAYTON TENHOFF, ESQUIRE**



**Reported By:**     *Katherine Powell Sullivan, CSR #5812*
                     *Official Reporter - U.S. District Court*

# P R O C E E D I N G S

1

2  **OCTOBER 11, 2011**                                **10:07 A.M.**

3

4       **THE CLERK:**  Calling case C 09-5191, Stephanie Enyart

5  versus National Conference of Bar Examiners.

6       Appearances, Counsel.

7       **MR. TENHOFF:**  Good morning, Your Honor.  Greg Tenhoff

8  for the defendant National Conference of Bar Examiners.

9       **THE COURT:**  Good morning.

10       **MS. LEVINE:**  Good morning, Your Honor.  Anna Levine

11  from Disability Rights Advocates for Stephanie Enyart.

12       **MR. LaBARRE:**  And Scott LaBarre for Stephanie Enyart.

13       **THE COURT:**  Good morning.

14       This matter is on for summary judgment.  My

15  understanding is that the Supreme Court denied cert.  Is that

16  correct?

17       **MR. TENHOFF:**  That is correct, Your Honor.

18       **THE COURT:**  So we now have the law of the case,

19  essentially, right?  And the law of the case provides for a

20  standard for an accommodation that will best ensure -- the

21  examination is selected and administered so as to best ensure

22  that when the examination is administered to an individual with

23  a disability that impairs sensory, manual, or speaking skills,

24  the examination results accurately reflect the individual's

25  aptitude or achievement level, or whatever other factor the

1  examination purports to measure, rather than reflecting the

2  individual's impaired sensory, manual, or speaking skills.

3          So that's called the "best ensure" standard.  Is

4  there any issue as to that?

5          **MR. TENHOFF:**  There isn't, Your Honor.

6          I think the question here is as applied and how to

7  apply it because we -- you may be the first Court who has to

8  apply that standard.

9          **THE COURT:**  Well, okay.  So in your brief --

10          **MS. LEVINE:**  Your Honor, if I may be clear, do you

11  mean our moving brief, or the opposition?

12          **THE COURT:**  Opposition brief.

13          You suggest that the test is whether or not there is

14  a reasonable alternative accommodation rather than the best

15  ensure standard.

16          **MR. TENHOFF:**  Actually, Your Honor --

17          **THE COURT:**  That's what I don't understand.  If you

18  accept the standard of the Circuit, why do you argue that?

19          **MR. TENHOFF:**  Well, two things, Your Honor.

20          First of all, the brief was submitted prior to the

21  ruling on our petition for cert.

22          Secondly, I believe we entitled all of our arguments

23  that even if a best ensure standard applied, that there are

24  disputes of material fact that would preclude summary judgment.

25          **THE COURT:**  Yeah, I'm first going to the standard.

1          MR. TENHOFF:  Correct.

2          THE COURT:  Then I'll go to whether there's a

3   material issue.  But as to the standard, the standard is best

4   ensure.

5          MR. TENHOFF:  That is correct, Your Honor.

6          It's our position that that standard needs to be an

7   objective standard based on all the evidence, and not simply

8   upon Ms. Enyart saying, I believe this best ensures, this is

9   measuring my aptitude and, therefore --

10         THE COURT:  Well, we'll get to that.  That's a

11  question of whether or not, basically, under the -- with the

12  experts, whether or not there is a material dispute as to the

13  accommodation, which accommodation would best ensure the person

14  for passing.

15         MR. TENHOFF:  Well, actually, Your Honor, it's

16  best ensure --

17         THE COURT:  Or best ensure that the disability

18  doesn't play a role in connection with her ability to pass.

19         MR. TENHOFF:  Correct.  You're measuring aptitude,

20  not disability.

21         THE COURT:  Right.

22         MR. TENHOFF:  That's what best ensures that.

23         THE COURT:  Okay.  So, therefore, I should disregard

24  your language and your argument to the extent you challenge the

25  best ensure standard.

1          **MR. TENHOFF:**  That's correct, Your Honor.

2          **THE COURT:**  Okay.  Well, I have reviewed the -- then

3   moving on, I've reviewed the expert's testimony.

4          Did you have an expert testify or give a deposition?

5          **MR. TENHOFF:**  We had -- Dr. Damari submitted a

6   declaration in connection with the motion for preliminary

7   injunction way back in January of 2010, which we've cited in

8   our papers.

9          **THE COURT:**  Doctor who?

10          **MR. TENHOFF:**  Dr. Damari.

11          **THE COURT:**  Damari.

12          **MR. TENHOFF:**  And part of what we've also put into

13   evidence is excerpts from Dr. Sarraf's deposition, who was the

14   treating -- the treating ophthalmologist for Ms. Enyart.  And

15   we've specified issues we have with his testimony.  And, in

16   fact, I don't think he's actually even prepared to opine as to

17   whether these accommodations are the only ones that would best

18   ensure that.

19          **MS. LEVINE:**  Your Honor, actually, that's a

20   misrepresentation of the evidence.

21          Dr. Sarraf was not put into evidence for the purpose

22   of affirming the best ensurer standard.  There were other

23   experts who did.

24          But, in deposition, he stood by his sworn testimony

25   in the Form B statement that she needs this accommodation.  And

1  when the best ensure standard was put to him in deposition, he

2  affirmed it.

3          **MR. TENHOFF:**  Your Honor, when Dr. Sarraf testified

4  that the form that was filled out, was filled out by

5  Ms. Enyart, he signed it.

6          But, perhaps more importantly, that recommendation --

7  this is the only mechanism by which she can read and process

8  information on the exam -- was based solely upon what

9  Ms. Enyart told him.  Again, not on her medical condition.  Not

10 on his expert testimony.  Not on his expert opinion.

11         And, again, that comes down to looking at the

12 standard as applied.  Is it sufficient for Ms. Enyart to simply

13 say, I believe this accommodation best ensures that we're

14 measuring my aptitude, or does there have to be more than that?

15         It's our position there has to be more than that.

16 Otherwise, there's no standard at all.

17         **THE COURT:**  I didn't understand Dr. Sarraf's

18 expertise to go to the question or being inquired into as to

19 the best ensure standard.

20         **MS. LEVINE:**  That's correct, Your Honor.  He was

21 submitted for two points, which is basically her diagnosis and

22 her acuity, that she's blind.

23         **THE COURT:**  And neither of those is challenged.

24         **MS. LEVINE:**  Neither is challenged.

25         **THE COURT:**  Right.  I don't think you take an expert

1  and by asking a question, that's really what you're using the

2  expert for.  He was not proffered for that purpose.  So putting

3  him aside, who do I look at to -- what expert did you provide?

4          **MR. TENHOFF:**  Dr. Damari is -- had put in a

5  declaration in connection with the preliminary injunction.  And

6  what Dr. Damari said was, it's my opinion, based upon a review

7  of her medical records, that, in fact, she can read and process

8  information based upon these other methods of accommodation

9  primarily because, A, she successfully used those in the past;

10  and, B, that her medical condition hasn't changed, as evidenced

11  by not only her medical records but also Dr. Sarraf's testimony

12  in August of 2011.

13          In -- opposing that is Frederick Schroeder, who's

14  never examined and is not a treating physician of any kind.

15  And also, I believe it's Mr. Britton who, again, in his

16  deposition said, I came to this conclusion because this is what

17  Ms. Enyart told me.

18          Again, is it sufficient for her to say --

19          **THE COURT:**  Before we get there, let's talk about

20  Dr. Damari.

21          **MS. LEVINE:**  Your Honor.

22          **THE COURT:**  Did Dr. Damari have an opinion as to the

23  best ensure standard?

24          **MR. TENHOFF:**  He did not as to the best ensure

25  standard.

1       **THE COURT:**  Okay.  So I don't look at his testimony

2 as creating a material fact as to whether or not there is a

3 dispute as to -- as to what accommodation would bring about the

4 best ensure -- meet the best ensure standard.  I don't look at

5 it for that.  Maybe I can look at it for something else, but I

6 don't look at it for that.  Is that correct?

7       **MR. TENHOFF:**  That is correct.

8       **THE COURT:**  Okay.  That being correct, where do I

9 look at any testimony that you produced in order to determine

10 whether or not the best ensure standard is met by these types

11 of accommodations that have been suggested by the plaintiff?

12       **MR. TENHOFF:**  I think what you can look at, Your

13 Honor -- and it's, I believe, the first argument in that

14 section -- is when you look at -- and, again, it is a material

15 fact when what this Court has been told has been that the

16 combination of screen reading JAWS and ZoomText is the only way

17 she can effectively read and process information.

18       **THE COURT:**  Maybe I don't care "is the only way."

19 Maybe what I have to do is look at to see whether or not there

20 is a dispute as to whether that way, whether the way that has

21 been suggested, would or would not best ensure the

22 accommodation that's required.

23       And my question to you is:  Where does the evidence

24 in the record suggest that that way, not some other way, but

25 that way will not best ensure?

1          **MR. TENHOFF:**  The evidence is in the following form:

2    On one side we look at what Ms. Enyart had done in the past

3    with different accommodations.  The fact that she graduated

4    from Stanford using live readers.  All her work on the LSAT

5    prep, all her work on the LSAT, all her work in law school, all

6    the law school exams, all of those, as laid out in the brief,

7    that says this is what she used before successfully.  And very

8    successfully.  And here's what we compare it to.

9          She's now taken the MBE twice with JAWS and ZoomText.

10   She's taken it three times.  We only know two scores.  Both of

11   those times she scored in -- below the 5 percentile nationwide.

12         So how do we explain the discrepancy where someone

13   says this best ensures you measuring my aptitude with the fact

14   she performed so well with these other accommodations through

15   her lifetime -- academic testing lifetime -- and how she's

16   doing now with the accommodation she requires.

17         And there's actual evidence before this Court that

18   what Ms. Enyart has said in the past is, I am now fully

19   dependent on learning by listening.  That's what she said to

20   UCLA, twice.  And that evidence is in the record.

21         So here we have someone who, when she's taking exams

22   using those mechanisms, was doing well.  Now she's using these

23   mechanisms and not doing well.  It creates a dispute of fact as

24   to what -- are we measuring the disability or not?

25         If she cannot visually see the text or for some

1  reason the ZoomText is not --

2          (Interruption.)

3          **THE COURT:**  I have to excuse myself.  I'm sorry.

4  I'll be five minutes.

5          (Pause)

6          **THE COURT:**  Sorry.  I don't usually do that.

7          So, we can go right ahead.

8          **MR. TENHOFF:**  Thank you, Your Honor.

9          Let me just make two final points when we're talking

10  about the difference between past successful use with other

11  accommodations and how she's performing on the MBE.

12          First of all, we put evidence before the Court,

13  primarily through Dr. Sarraf, her treating ophthalmologist, and

14  her medical records, that the medical condition hasn't changed

15  during the times that she was successfully using those

16  accommodations.

17          Secondly, there's something very unique about the

18  accommodation that she's asked for here.  I actually asked

19  Dr. Sarraf in his deposition:

20                ""Have you ever had another patient with

21                macular degeneration" -- which is what she

22                has -- "request from you a recommendation

23                that requires this synchronized audio and

24                video input, the JAWS and ZoomText

25                combination?"

```
 1              "No.
 2              "QUESTION:  Ms. Enyart is the only one you've
 3              heard that from?
 4              "ANSWER:  Yes."
 5         So here is when we're looking at directly the
 6    application of a subjective standard.  Now she's saying, I
 7    believe this best ensures.
 8         Do we have to take that at face value or do we have
 9    to make our own determinations?
10         It's our belief that that's an issue for this Court
11    to decide at trial and not on summary judgment.
12         MS. LEVINE:  Your Honor, if I may, I'd like to go
13    back to the experts, because what defendant has thrown out at
14    you is a whole lot of isolated information that is not
15    connected in any way to the legal standard in a way that would
16    allow an adverse inference to be drawn.  And there's a reason
17    for that.
18         I would like to point, first, to who we have.  The
19    defendant has pointed to Schroeder and to Britton regarding the
20    best ensure standard.  There was an additional expert, who was
21    Solano Rainy.  She was not even challenged by defendant.  They
22    did not address her expert testimony at all in their opposing
23    brief.  On her record alone, this Court could grant summary
24    judgment.
25         Now, moving from that to the isolated sort of
```

1  instances of information, I think we need to think about what

2  the standard is for summary judgment.  The standard is whether

3  there is a genuine dispute of material fact.

4          Now, they have pointed to past use of readers.

5  There's no dispute about that.  She did use readers at Stanford

6  and at UCLA Law School.  She used --

7          **THE COURT:**  Look.  Look.  Look, one thing that's

8  common to everybody, we've all taken the Bar.  I think the Bar

9  is nearly sui generis.  I mean, there's nothing as horrible as

10  the Bar.

11          (Laughter)

12          **THE COURT:**  Unless you have to take it a second time.

13  You know, the pressures are enormous.  It's a win/lose

14  situation.  There are no second places.  It is fraught with an

15  enormous amount of emotional and psychological impact on nearly

16  every level.  I say "nearly," because my brother didn't have a

17  problem with it.

18          (Laughter)

19          **THE COURT:**  On the other hand, I did, in the terms of

20  going through it.  And I have a sense, and I'm sure it's a

21  sense shared by everybody, both lawyers, that there is

22  something very special about it.

23          She passed this at Stanford, and did this and did

24  that.  I understand that.  But the situation -- and I

25  understand those are testing, and they're testing on the

1  academic subjects in which she's being tested on on the Bar.

2  And I understand there are a number of similarities.

3           But there's also a major, major difference.  I mean,

4  I don't know.  You say she's -- I don't know that I look at how

5  well she's done on the MBE or anything else to try to figure it

6  out.  You know, is the accommodation not working?  I don't -- I

7  don't know what inferences one draws from all of that.  I'm not

8  sure that that's a fair thing for me to do or that I should

9  even consider it.

10           **MS. LEVINE:**  We absolutely agree, Your Honor.

11           And, in particular, if defendant wanted to try to

12  draw something from her experience on the MBE, they needed to

13  introduce evidence on that point.  The record is closed.

14  Nothing is going to come forward at trial that would change

15  that.

16           I don't know if they propose putting her on the stand

17  and having her take the LSAT with a computer-based

18  accommodation and then the Bar with the computer-based

19  accommodation.  Even that, I'm not certain what that would

20  show.

21           What we can know is what her primary reading method

22  is that has -- is something that there is a great deal of

23  evidence in the record on, and what she's familiar with.

24           And on the importance -- and we can know the

25  importance of the primary reading method that's -- we have

1  expert opinion on that point.

2          **MR. TENHOFF:**  Your Honor, if I may, two points.

3  First of all, we did object to Ms. Rainy's declaration when she

4  first put it in way back when in the preliminary injunction

5  standard (sic).

6          Secondly, the most relevant comparison in our mind --

7          **THE COURT:**  I'm sorry, you say you -- you did what?

8          **MR. TENHOFF:**  When -- Ms. Rainy submitted the

9  declaration back in conjunction with the first preliminary

10 injunction motion, and we submitted objections to her testimony

11 on lack of foundation and many other grounds.  So, that's in

12 the record.  So, there is objections to that testimony.

13         **THE COURT:**  So, I have to deal with the foundational

14 objections.

15         **MR. TENHOFF:**  It is in the record, yes, Your Honor.

16         But, secondly, we think when you actually look at

17 the -- when you actually look at what's relevant -- remember

18 we're only talking about one portion of the Bar Exam.

19         The essay portion and performance portion, she has

20 JAWS and ZoomText.  She takes it that way each time.  That has

21 nothing to do with what we're talking about.

22         We're talking about the MBE section, which is a

23 six-hour multiple choice exam.  The LSAT is a four-hour

24 multiple choice exam.  She did great on the LSAT with the same

25 medical condition and a reader accommodation, and she's having

1 this much difficulty on the MBE.  We have to say, why is that?

2          **MS. LEVINE:**  Your Honor --

3          **MR. TENHOFF:**  And there's been nothing that's been

4 set forth by any expert to explain that discrepancy.  Why is

5 that the case?  Is this, at the end of the day, the best

6 method?

7          **THE COURT:**  Well, you're asking the question why,

8 because of the inference you want drawn from it.  And the

9 answer to it, in your view, is that this is not an -- this

10 accommodation doesn't work in the sense -- well, what are you

11 saying?  You're saying that this --

12          **MR. TENHOFF:**  If what we're going to look at, Your

13 Honor, is what is the accommodation that accurately -- that

14 best ensures that we're measuring aptitude.  That's our

15 standard; we all agree on that.

16          And if we're going to do that, then don't we have to

17 understand why there's a big discrepancy there?  And there's no

18 evidence from their side explaining that discrepancy.  And

19 we've got a dispute of material fact as to the ultimate issue

20 in this case.

21          **MS. LEVINE:**  Your Honor, they're saying up is down.

22 They're saying that there is no evidence explaining a

23 discrepancy that they think is a discrepancy and is relevant.

24          If they wanted to submit evidence to suggest that

25 this is a relevant -- that this is a reasonable inference they

```
1    want to draw from it and that it's relevant to the best ensure

2    standard, they could have submitted expert evidence on this

3    point.

4         We've given our expert disclosures for trial, and

5    they stand on their Damari declaration from the preliminary

6    injunction.  That is the evidence for trial.  It's the

7    evidence, at this point, and it draws no inference that they

8    wish to draw from that.

9         MR. TENHOFF:  Well, Your Honor, you don't need an

10   expert to see -- you know, as Bob Dylan said says, you don't

11   need a weatherman to see which way the wind blows.

12        The fact of the matter is this:  She took similar

13   exams throughout her academic career with a different

14   accommodation and did well.  She took the MBE with the

15   accommodation she demands and did very poorly.

16        MS. LEVINE:  They're absolutely --

17        MR. TENHOFF:  You can draw an inference from those

18   mere facts that perhaps, just perhaps this is not, despite what

19   she says, the best accommodation for her.

20        THE COURT:  I don't know that you draw that.  I don't

21   know that it follows from that.  I mean, I -- that's what I --

22        MS. LEVINE:  Your Honor --

23        THE COURT:  A recent dean of Stanford Law School took

24   the Bar and failed.  Okay.  What am I supposed to draw from

25   that?
```

```
 1            Let's say you were standing in front of me and
 2    saying -- did you go to Stanford, by the way?
 3            MR. TENHOFF:  No, I went to --
 4            THE COURT:  All right.  So you can talk about it.
 5            (Laughter)
 6            THE COURT:  To me, here's a person, a preeminent --
 7    you know, a legal scholar doesn't pass the Bar.  Well, why not?
 8    Why not?  Did she study the wrong things?  Is she not very
 9    bright?  Why not?  I don't know.  There's so many whys that I
10    think that's a big vacuum of unknowns.
11            I don't know that I look at a difference in
12    performance and can come to the conclusion that this isn't a
13    method, the best method or the method that will best ensure her
14    passage.
15            I don't think you can look at it that way because if
16    that's the case, if that's the case, then I don't know what it
17    teaches you.  But I guess you try it a couple of times and get
18    rid of it altogether because she didn't pass.
19            MR. TENHOFF:  Well, Your Honor, also, it's -- that's
20    not the only disputed fact in this case.
21            THE COURT:  I don't know that that's a dispute.
22    That's what I'm saying.  I don't understand what the dispute
23    is.  She didn't pass or did poorly on it doesn't -- doesn't
24    dispute -- doesn't raise an issue as to whether or not this
25    accommodation best ensures it.
```

1            **MS. LEVINE:**  Your Honor, I think -- I believe --

2            **MR. TENHOFF:**  Your Honor --

3            **MS. LEVINE:**  -- Ms. Enyart would like to know, more

4    than anyone, why she didn't pass the Bar Exam.  She does not

5    dispute that she did poorly on the Bar Exam, and she wishes she

6    had done better.

7            And we may never know, and would not know if we went

8    to trial, why she did poorly on the Bar Exam.

9            **THE COURT:**  The answer is, she'll either pass or

10    won't pass.  Nobody is suggesting there ought to be a different

11    scoring system.  Even with these best ensure methods, she

12    didn't pass.

13            So the question is, should she try it again?  I

14    assume she is trying it again.

15            **MS. LEVINE:**  And we could also point to things like

16    the public pressures of -- if we're speculating, to the public

17    pressures of litigation, to technological problems that slowly

18    have been resolved in this past --

19            **THE COURT:**  Well, the past time she took the Bar, it

20    was by consent, wasn't it, keeping the --

21            **MR. TENHOFF:**  What happened was the injunction --

22    there was two -- a total of three injunctions.  And so the last

23    one, we don't know the results, Your Honor.

24            But, again, our point is, if you have the same

25    aptitude and you're getting very different results with two

1  different mechanisms, that you can find there's a dispute of

2  fact as to whether the one you're doing poorly with is truly

3  the one that best ensures you're measuring that aptitude.

4          MS. LEVINE:  But the question is, the same aptitude

5  on what?

6          THE COURT:  Pardon?

7          MS. LEVINE:  The same aptitude on what, would be the

8  question.  And the answer -- and they have not submitted any

9  evidence to suggest that the Bar Exam is comparable in length,

10 complexity, subject matter tested to any of the things to which

11 they would compare it.

12         MR. TENHOFF:  Well, I'm hoping it's commensurate with

13 what she did in law school.

14         THE COURT:  I don't know.  That was exactly my point

15 with Kathleen Sullivan.  I think she probably did very well in

16 law school.  What's your explanation for that?

17         MR. TENHOFF:  For Miss Sullivan?

18         THE COURT:  Yeah.

19         MR. TENHOFF:  I would hate to speculate, Your Honor.

20 I think it was disputed --

21         THE COURT:  Right.  You would hate to do it, and I

22 would, too.

23         MR. TENHOFF:  But that's --

24         THE COURT:  But almost, in a way, you're asking me to

25 do it here.  And I don't know about the discrepancy.  I don't

1   know.  But I don't know that it necessarily is tied in some way

2   to the accommodation.

3          It may be that she doesn't know -- I mean, with all

4   due respect, she doesn't know the law or that this is an

5   extraordinarily -- you know, I don't know why people don't pass

6   the Bar.  I think some people don't pass the Bar because they

7   don't know the law.

8          Some people don't pass the Bar because they do very

9   poorly in exam, though they might make great lawyers.  I mean,

10  there's a whole collection of reasons why people don't pass the

11  Bar.  And I don't know that it proves or it is some evidence of

12  the failure of the accommodations to meet the standard that is

13  suggested here.

14          **MS. LEVINE:**  And, Your Honor, she's passed the MPRE.

15  I mean, that is, she got the accommodation that -- the

16  computer-based accommodation on the MPRE portion -- sorry, the

17  Multistate Professional Responsibility Examination, which is a

18  shorter exam.  And she got them on the Bar Exam.  And she

19  passed one the second time, and the other she hasn't passed

20  yet.

21          What do we make of this?  Again, who knows?  It would

22  be entirely speculative.

23          **THE COURT:**  There's no question that you could have

24  some scientific study of this.  But this is a one-person

25  scientific study, and so you can't really do it.  And that's

1  why I'm not sure, scientifically, you can draw the types of

2  inferences that you think ought to rise to credible evidence of

3  a material issue of fact as to whether or not these

4  accommodations meet the best ensure standard.

5          That's the argument on that.  I can work my way

6  through that.  I don't think the burden is -- you met the issue

7  on the burden.  I mean, it's a margin of burden.  It's a burden

8  by the way -- the way I'm looking at it, you're probably about

9  to pass it on -- if I ordered it, you'd pass it on to the

10  states to have to pay for it in connection with the

11  administration of the test.

12          MR. TENHOFF:  Your Honor, two points.  One is that if

13  we're all here in this courtroom today and we don't know the

14  answer to that question as to why there is that discrepancy,

15  then how do we not have a dispute in material fact --

16          THE COURT:  Oh, no, that's not the test.  I mean, I

17  know there's no world peace, but I don't know that I'm going to

18  have a trial on it.  No, no, no.

19          I don't know why she didn't pass the Bar.  I don't

20  know why a lot of people don't pass the Bar.

21          MS. LEVINE:  A jury --

22          THE COURT:  And I don't know that a jury is going to

23  know why she didn't pass the Bar.  And I don't know that I

24  would instruct the jury to, Please tell me why she didn't pass

25  the Bar, in your opinion.  I don't think that's the

1    fact-finding issue that is presented to a jury.

2            I think the question is, I have the experts, I have

3    your objections to the experts.  I know what experts were out

4    there, that is proffered in connection with these issues.  And

5    I think I'm simply going to decide the case based upon the

6    record in front of me.  I think I'm in a position to do so.

7            (Simultaneous colloquy between counsel which was not

8            reportable.)

9        **MS. LEVINE:**  Your Honor, there are one or two other

10   things I'd like to point out about the experts.  One inference

11   that defendant seeks to want to draw from this sort of

12   scattering of documentary and other evidence is that Ms. Enyart

13   doesn't need visual input.  This is something defendant has

14   just again reiterated in argument.

15           I'd like to point out that their own expert has

16   rebutted that.  In multiple places in his deposition, he said

17   that she admitted that she needs visual and auditory input.  So

18   any inference -- and, moreover, logic rebuts that inference

19   because they -- NCB has offered as an accommodation a CCTV, a

20   closed-captioned television, or large print font.

21           So the inferences are simply not logical and not

22   valid in light of the expert evidence.

23           And I'd like to go back to the evidentiary objection

24   because we have to look at the record as a whole.  And the

25   record as a whole is not just Solano Rainy.  It's not just

1   Frederick Schroeder and as to his creditability, and

2   Dr. Britton's credibility.  We've talked about that in our

3   briefing.  That doesn't defeat a motion for summary judgment.

4           And, moreover, in terms of Britton's credibility and

5   whether he solely relied on what Ms. Enyart told him, it's

6   simply not what is in evidence.  He -- what is in evidence is

7   that to some extent he relied on that.  There's no evidence

8   from NCBE that that's an invalid -- that patient report is

9   invalid.  But he also relied on watching her, on examining her

10  in person.  Something their own expert did not do.  And he

11  looked at the documentary evidence.

12          Now, I am, again, looking at the experts on their

13  side.  You have Dr. Damari, who has no opinion as to best

14  ensure, who said that it is really impossible for me to use the

15  best ensure standard --

16          **THE COURT:**  Well, he has no opinion.

17          **MS. LEVINE:**  He has no opinion.

18          **THE COURT:**  I don't know why I would consider him.

19  He has no opinion on that subject.  So, fine, he has no

20  opinion.  You take him, you put him to the side.

21          **MS. LEVINE:**  We actually agree.

22          **THE COURT:**  That's the way you do it.  Somebody comes

23  in and says, I have an opinion and this is what my opinion is

24  and this is what it's based on; he has an opinion.  And you

25  take his opinion.  You see whether or not that opinion is

```
 1  different from the other person's opinion.  And it creates a

 2  triable issue of fact.

 3          Dr. Damari didn't have an opinion on that.

 4          MS. LEVINE:  And so we --

 5          THE COURT:  If the question was simply to make a

 6  reasonable accommodation, that's not the issue.  The issue here

 7  is that would best ensure, an accommodation that would best

 8  ensure.

 9          MS. LEVINE:  We agree.

10          MR. TENHOFF:  Your Honor --

11          THE COURT:  Yes.

12          MR. TENHOFF:  -- if I may, two final points.  I

13  appreciate it.  I know you have a long calendar.

14          THE COURT:  No, I don't have a long calendar.  A

15  short calendar.  That's all right.

16          MR. TENHOFF:  There are other disputes of material

17  fact that we've laid out in our brief.

18          THE COURT:  What else?

19          MR. TENHOFF:  These are -- and they're all in our

20  brief.  They are whether Ms. Enyart only used JAWS and ZoomText

21  in law school.  They are --

22          MS. LEVINE:  I'm sorry.  We concede that she did not

23  only use JAWS and ZoomText in law school.  There is no dispute

24  there.

25          MR. TENHOFF:  Well, Your Honor, we have declarations
```

1   from Ms. Enyart saying that that's what she did.

2           **THE COURT:**  They're not disputing it.

3           **MR. TENHOFF:**  I understand, but it --

4           **THE COURT:**  That's not a material issue of dispute,

5   where one side comes in and says, We think this happened, and

6   the other side says, You do?  So do we.  That's not actually a

7   dispute.

8           **MR. TENHOFF:**  But the credibility of Ms. Enyart is a

9   dispute of fact.  When she puts a statement in under penalty of

10  perjury before this Court, which is incorrect and --

11          **THE COURT:**  Well, there may or may not be a dispute

12  of fact depending on -- on to what extent I'm considering her

13  credibility in making a determination.  That's right.  I don't

14  disagree with that.  That is to say, a witness's credibility

15  may be in dispute.

16          But if ten people say X, and an eleventh person, who

17  happens to be the plaintiff, says X, and that plaintiff is

18  unbelievable, I don't have to go to trial as long as there's

19  nobody outside saying not X.

20          **MR. TENHOFF:**  Well, Your --

21          **THE COURT:**  So that's the way it works.  That's the

22  way it works.

23          **MR. TENHOFF:**  And we're talking about X is, this is

24  the accommodation that best ensure --

25          **THE COURT:**  Well, if she said, I thought lollypops

1  should be given to me, or something like that, I'd say fine,

2  that's your view, not ours.  But it's not at issue here.  It's

3  not the issue to which the other side has disputed the

4  credibility.

5          The way you dispute the credibility, I thought, would

6  be in calling a -- an expert who would say, I want to tell you,

7  after looking at her, the evidence in this case, in my view,

8  this is the accommodation that would best ensure the

9  minimization of the disability in connection with taking the

10  test.  That's the -- that's the contest.

11          You see, I look at something like this and I try to

12  figure out, in part, is a trial going to be useful?  Is it

13  going to do something more than, what, 300, 500 pages of

14  depositions and so forth has accomplished here?  That's what I

15  do.

16          **MR. TENHOFF:**  Right.

17          Your Honor, the one key here, all roads lead back to

18  Ms. Enyart saying -- whether it's the experts or anyone else --

19  this is the mechanism that best ensures.

20          **THE COURT:**  Well --

21          **MR. TENHOFF:**  That's what she says.

22          **THE COURT:**  -- leads to the experts and, I guess, to

23  Ms. Enyart.  But, you know, the plaintiff comes in -- to tell

24  you the truth, while I appreciate Ms. Enyart, as I would any

25  party to the case, her credibility is not nearly as important

1 as the testimony of the experts and based upon facts which are

2 not in dispute.  That's what's important here.

3          MR. TENHOFF:  But the testimony of the experts comes

4 directly from Ms. Enyart.

5          THE COURT:  Solely that?  Solely that?  Then I think

6 that there's --

7          MR. TENHOFF:  That's the only basis for Dr. Sarraf's

8 recommendation, the ophthalmologist.  And if that's the case,

9 then we have -- here we have Miss Enyart --

10          THE COURT:  Dr. Sarraf isn't an expert on the issue

11 of best --

12          MS. LEVINE:  He's not, Your Honor.

13          MR. TENHOFF:  And then we can look -- then we can

14 look at Mr. Britton.  We can look at Mr. Schroeder.  It all

15 comes down to what did she say to them.  That's the basis --

16          THE COURT:  Okay.  That's your argument.  Thank you.

17 Submitted.  And I'll write something.

18          MR. TENHOFF:  Thank you, Your Honor.

19          MS. LEVINE:  Thank you, Your Honor.

20          THE COURT:  Now, I guess the Bar results will be out

21 November 18th.  Is that right?

22          MS. LEVINE:  November 20th, I believe, Your Honor.

23          THE COURT:  Twentieth?

24          MS. LEVINE:  However, there's a value in finality.  I

25 would point that out.  And we hope that we will have a decision

1  on this before then.

2          **THE COURT:**  Okay.  Thank you.

3          **MR. TENHOFF:**  Thank you, Your Honor.

4          (At 10:47 a.m. the proceedings were adjourned.)

5                      -   -   -   -

6

7

8                    **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Friday, October 21, 2011

13

                    s/b Katherine Powell Sullivan
14          _____

15      Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter
16

17

18

19

20

21

22

23

24

25