**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEPHANIE ENYART,

       Plaintiff,

  v.

NATIONAL CONFERENCE OF BAR
EXAMINERS, INC.,

       Defendant.

_____/

No. C 09-05191 CRB

**MEMORANDUM AND ORDER
GRANTING SUMMARY JUDGMENT**

     Stephanie Enyart brings this action against the National Conference for Bar
Examiners, Inc. ("NCBE"), alleging violations of the Americans with Disabilities Act of
1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Unruh Civil Rights Act ("Unruh Act"),
California Civil Code § 51, *et seq*. Ms. Enyart, who is legally blind, requested a set of
accommodations on the professional licensing exams required to become a member of the
California state bar. This Court previously entered two preliminary injunctions (dkts. 58, 89)
ordering NCBE to provide Ms. Enyart her required accommodations on the multiple choice
Multistate Bar Exam ("MBE") and the Multistate Professional Responsibility Exam
("MPRE"). Ms. Enyart has since passed the MPRE, so the Court need only deal with the
MBE accommodations. The Ninth Circuit has now resolved the issue of what standard to
apply, holding the "best ensure" standard promulgated by the DOJ regulations is appropriate.
As the Court finds there is no genuine issue of material fact, it GRANTS the Plaintiff's
Motion for Summary Judgment.

**United States District Court**
For the Northern District of California

# I.    BACKGROUND

Stephanie Enyart is legally blind.  Enyart Declaration in Support of Motion for Preliminary Injunction ("Enyart Decl.") (dkt. 36) ¶ 6.  She suffers from macular degeneration and retinal dystrophy, with a likely diagnosis of Stargardt's Disease.  Levine Declaration in Support of Motion for Preliminary Injunction ("Levine P.I. Decl.") (dkt. 33) ¶¶ 17, 32, Exs. 12, 26.  According to Ms. Enyart, "[o]ver the years, based upon the individual evaluations and recommendations of assistive technology experts and training I have received in using assistive technologies, and practice, I have learned which technologies best suit my reading needs given my specific disability and changes in my vision over time."  Enyart Decl. ¶ 7.

Ms. Enyart explains that one particular accommodation, namely, a computer equipped with screen reading software (JAWS) and screen magnification software (ZoomText), is required for her "to read lengthy texts, legal and academic material, [and] to perform legal work."  Id. ¶ 8.  Further, "it is what I used to take all of my law school examinations, with the exception of a single multiple choice portion of one law school examination, which I took using only the assistance of a human reader, with disastrous results."  Id.  In sum, Ms. Enyart asserts that "[t]he combination of JAWS and ZoomText is the only method through which I can effectively read and comprehend lengthy or complex material."  Id. ¶ 12.

NCBE is a private nonprofit corporation that "develops and provides standard examinations for the testing of applicants for admission to the practice of law."  Answer of Defendant NCBE ("Answer") (dkt. 20) ¶ 13.  NCBE has developed the MBE and the MPRE and determines the formats in which they will be offered to test takers.  Id.  To be licensed to practice law in California, applicants must pass both the MPRE and the general bar examination, which includes the MBE.  Levine P.I. Decl. Ex. 36 at N0065; Cal. Bus. & Prof. Code § 6060(g).

Ms. Enyart requested JAWS and ZoomText to read the MPRE on several occasions beginning with the March 2009 administration of that exam.  Enyart Decl. ¶¶ 18, 20, 21.  She requested this accommodation on the California Bar Exam beginning in July 2009.  Id. ¶ 23.  These requests were accompanied by documentation from Ms. Enyart's vocational

1    rehabilitation counselor, treating ophthalmologist, law school assistant dean, and assistive

2    technology specialist.  Levine P.I. Decl. Exs. 1, 3, 14-16, 18-19, 22-23, 25-30, 35, 38-40, 42,

3    46-53.

4          The State Bar of California approved Ms. Enyart's request for accommodations on the

5    sections of the California Bar not controlled by the NCBE and stated its willingness to permit

6    her to the take the MBE with her requested accommodation, if allowed by NCBE or if

7    ordered by this Court to do so.  Levine P.I. Decl. Exs. 5-6; Stipulation re Dismissal of State

8    Bar (dkt. 25).  NCBE refused to allow Ms. Enyart her requested accommodations.  This

9    Court first entered a Preliminary Injunction on February 4, 2010, ordering NCBE to allow

10   Ms. Enyart her requested accommodations on the February 2010 administration of the

11   California Bar Exam. Dkt. 58.  Ms. Enyart did not pass this administration of the Bar Exam,

12   and NCBE again refused her requested accommodations for the July 2010 administration of

13   the Bar Exam.  This Court then entered a Second Preliminary Injunction on June 22, 2010,

14   ordering NCBE to allow Ms. Enyart her requested accommodations, including the ability to

15   change the size and font of the text, on the July 2010 administration of the Bar Exam.  Dkt.

16   89.  Ms. Enyart also did not pass this administration of the Bar Exam.  Declaration of

17   Douglas Ripkey ("Ripkey Decl.") (dkt. 125) ¶¶ 3-4.

18         The Ninth Circuit has now affirmed this Court's grant of the Preliminary Injunctions.

19   Enyart v. Nat' Conference of Bar Exam'rs, Inc., 630 F.3d 1153 (9th Cir. 2011).  In addition

20   to affirming the grant of the Preliminary Injunctions, the Ninth Circuit set out the appropriate

21   standard for evaluating an accommodation under 42 U.S.C. § 12189.  Section 12189, which

22   falls within Title III of the ADA, governs professional licensing examinations.  The

23   Department of Justice issued a regulation interpreting the statute, 28 C.F.R. § 36.309, and

24   requiring a private entity offering a licensing examination to assure that "the examination is

25   selected and administered so as to best ensure that, when the examination is administered to

26   an individual with a disability that impairs sensory, manual, or speaking skills, the

27   examination results accurately reflect the individual's aptitude or achievement level or

28   whatever other factor the examination purports to measure, rather than reflecting the

3

United States District Court
For the Northern District of California

1    individual's impaired sensory, manul, or speaking skills." 28 C.F.R. § 36.309(b)(1)(i).  The

2    parties have referred to this as the "best ensure" standard.  The Ninth Circuit held the

3    regulation was entitled to <u>Chevron</u> deference, and that the "best ensure" standard applies.

4    630 F.3d at 1162.

5         Ms. Enyart now moves for summary judgment on her ADA and Unruh Act claims,

6    requesting declaratory relief and a permanent injunction.  NCBE opposes, stating there are

7    still genuine disputes over material facts.

8    **II.    LEGAL STANDARD**

9         Summary judgment is proper when "the pleadings, depositions, answers to

10   interrogatories, and admissions on file, together with the affidavits, if any, show that there is

11   no genuine issue as to any material fact and that the moving party is entitled to a judgment as

12   a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient

13   evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a

14   dispute is "material" only if it could affect the outcome of the suit under governing law.  <u>See</u>

15   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  A principal purpose of the

16   summary judgment procedure "is to isolate and dispose of factually unsupported claims."

17   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole

18   could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

19   issue for trial.'"  <u>Matsushita Elec. Ind. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986).

20   **III.   DISCUSSION**

21        Since there are undisputed material facts demonstrating as a matter of law that only

22   Ms. Enyart's requested accommodation would meet the "best ensure" standard, the Court

23   grants summary judgment and enters a permanent injunction.

24        **A.    The Motion is Not Premature**

25        First, NCBE argues summary judgment is premature here because it has petitioned for

26   a writ of certiorari before the United States Supreme Court, appealing the Ninth Circuit's

27   affirmance of the preliminary injunction.  Opposition to Motion for Summary Judgment

28   ("Opp'n") at 2.  The writ has since been denied.  <u>NCBE v. Enyart</u>, No. 10-1304, — S. Ct. —,

1   2011 WL 4536525 (U.S. Oct. 3, 2011).  Thus, this argument is moot and this Court must

2   apply the governing law as stated by the Ninth Circuit.

3          **B.     The ADA Claim**

4          Ms. Enyart brings claims under the ADA and the Unruh Act.  The Court turns to the

5   ADA claim first.

6                  **1.     The "Best Ensure" Standard**

7          While NCBE failed to acknowledge the "best ensure" standard in its Opposition, it

8   conceded at the hearing the standard applies.  The question before the Court is what

9   accommodations "best ensure" that Ms. Enyart's examination results accurately reflect her

10  aptitude rather than her disability.

11                 **2.     Admission and Use of Expert Testimony**

12          Under Fed. R. Evid. 702, expert testimony may be admitted only if it will assist the

13  trier of fact to understand the evidence or to determine a fact in issue.  To qualify, a witness

14  must have "knowledge, skill, experience, training, or education" relevant to such evidence or

15  fact in issue.  Fed. R. Evid. 702.  The rule is broadly phrased and liberally

16  construed.  <u>Thomas v. Newton Int'l Enters., Inc.</u>, 42 F.3d 1266, 1269 (9th Cir. 1994).  The

17  Ninth Circuit views "the admissibility of expert testimony as a subject peculiarly within the

18  sound discretion of the trial judge, who alone must decide the qualifications of the expert on

19  a given subject and the extent to which his opinions may be required."  <u>United States v.</u>

20  <u>Chang</u>, 207 F.3d 1169, 1172 (9th Cir. 2000) (quotation omitted) (where key issue was

21  authenticity of a securities certification, expert properly excluded where he had no

22  experience in identifying counterfeit securities).  A district court abuses its discretion when it

23  bases its decision on an "erroneous view of the law or a clearly erroneous assessment of the

24  facts."  <u>United States v. Rahm</u>, 993 F.2d 1405, 1410 (9th Cir. 1993).

25          The basic test for admissibility under Rule 702 is whether the expert will aid the trier

26  of fact.  <u>See</u> McCormick on Evid. § 13 (6th ed.).  The key inquiry is whether the witness has

27  sufficient skill or knowledge related to the pertinent field so that his inference will probably

28  be of some assistance to the untrained layman.  <u>Id.</u>; <u>United States v. Hankey</u>, 203 F.3d 1160,

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1168 (9th Cir. 2000).  An expert's knowledge may be derived from experience alone, and there is no per se requirement that a scientific expert have any particular training or license in order to testify.  Rahm, 993 F.3d at 1168.  In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court explained that expert testimony does need to rest on a reliable foundation and be relevant to the "task at hand."

After being qualified as an expert, there is also the question of whether the expert's testimony is admissible.  The trial court must consider the probativeness of expert testimony in determining its admissibility.  Rahm, 993 F.2d at 1412.  The Court may exclude testimony if the Court does not believe that scientific standards support the reliability of the expert's opinion.  In accordance with Daubert, a proponent must establish that the witness's underlying theory or technique qualifies as reliable scientific knowledge.  Daubert, 509 U.S. at 580.

Thus, generally, the Court looks to: (1) whether the expert opinion is based on scientific, technical, or other specialized knowledge; (2) whether the opinion would assist the trier of fact; (3) whether the expert has appropriate qualifications; (4) whether the expert's methodology fits the conclusions; and (5) whether the probative value of the testimony outweighs prejudice, confusion, or undue consumption of time.  Hankey, 203 F.3d 1168. The key concern is whether expert testimony will assist the trier of fact in drawing a conclusion as to a "fact in issue."  Rahm, 993 F.2d at 1411.

The use of different assistive technology in particular situations for particular types of disabilities presents questions suitable for expert testimony, and the expert testimony presented by both sides aids the trier of fact in deciding the issues presented.  Particularly, expert testimony is helpful to the Court in understanding and applying the "best ensure" standard to Ms. Enyart's particular situation.

### 3.    Expert Testimony

#### a.    NCBE Expert Testimony

NCBE does not point to or present any expert testimony regarding the "best ensure" standard.  In fact, NCBE's expert, Dr. David Damari, OD, stated, "it really is impossible for

6

United States District Court
For the Northern District of California

1    [him] to use the best ensure standard."  Levine P.I. Decl. Ex. 58 (Damari Dep.10:18-19) (dkt.

2    33-4).  He also stated that he did not "have an opinion as to best ensure."[1]  Id. (Damari Dep.

3    11:3-4).

4          Thus, NCBE does not point to any expert testimony addressing the relevant standard

5    that calls into question the expert testimony which does address the relevant standard.  This,

6    in conjunction with Ms. Enyart's expert testimony from Silvana Rainey and Dr. Bruce

7    Britton, demonstrates a lack of genuine dispute over whether Ms. Enyart's requested

8    accommodations are, in the opinion of experts, the accommodations that would "best ensure"

9    her performance on the Bar Exam reflects her legal knowledge, rather than her disability.

10                        b.    Ms. Enyart's Expert Testimony

11         Ms. Enyart put forth the testimony of several experts to support her claim.

12                              i.    Silvana Rainey

13         Ms. Enyart offered in support of her motion the testimony of Silvana Rainey, an

14   assistive technology consultant hired by the California Department of Rehabilitation.  See

15   Notice of Motion and Motion for Summary Judgment; Memorandum of Points and

16   Authorities in Support Thereof ("Mot.") at 12-13 (dkt. 141), citing Declaration of Silvana

17   Rainey in Support of Plaintiff's Motion for Preliminary Injunction ("Rainey Decl.") (dkt.

18   34).

19         There is not a form of accreditation for the assistive technology field.  Rainey Decl. ¶

20   7.  Thus, Rainey states her expertise and knowledge base has been developed through work

21   experience over the past fifteen years.  Id.  Rainey has provided consultation, assessment and

22   assistive technology training for individuals with visual disabilities working in a variety of

23   fields in the public and private sectors, including such clients as the Veterans Administration,

24   the Social Security Administration, the Department of Homeland Security – Immigration

25   Division, California and North Carolina Departments of Vocational Rehabilitation, Bank of

26

27         [1]  The facts Dr. Damari does testify to support Ms. Enyart's requested accommodations.  Dr.
     Damari states the requested accommodations are appropriate to Ms. Enyart's visual condition, and that
28   his opinion on why the accommodations were not reasonable was based upon test security issues, and
     area in which he has no expertise.  Levine P.I. Decl. Ex. 58 (Damari Dep. 11:17; 29:21-24; 11:20-25).

America, Wells Fargo, AAA, Alaska Airlines, and Business Object in Canada.  Rainey Decl. ¶ 6.  Her work has included every form of equipment available to assist individuals with visual disabilities, and she now operates her own company providing one-on-one assessments for individuals with visual disabilities, computer system customization, assistive technology and computer training and trouble-shooting.  Rainey Decl. ¶ 8.  In addition, she has developed and taught courses to train assistive technology teachers.  Rainey Decl. ¶ 9.[2]

---

[2]   Rainey's full qualifications are as follows:

6.  I have provided consultation, assessment and assistive technology training for individuals with visual disabilities working in a variety of fields in the public and private sectors.  Some of the clients I consulted for include: the Veterans Administration, the Social Security Administration, the Department of Homeland Security – Immigration Division, California and North Carolina Departments of Vocational Rehabilitation, Bank of America, Wells Fargo, AAA, Alaska Airlines and Business Object in Canada.

7.  I earned a Bachelor of Arts in History in 1984 from Universide Catolica do Salvador, in Brazil.  Since there is not a form of accreditation for the assistive technology field, my expertise and knowledge-base has been developed through work experience over the past fifteen years.

8.  I began my career in 1994 as a volunteer at the Lighthouse for the Blind in San Francisco and Vista College in Berkeley, California.  In these two positions, I trained individuals with visual disabilities how to use versions of assistive technology.  Within a year I was hired by the Lighthouse for the Blind as a Technology Lab Assistant and then spent the following three years there as an Assistive Technology Specialist.  During this period of time I worked with many clients with the full spectrum of levels of technologic sophistication and varied degrees of vision loss.  In this work, I used every form of equipment available to assists [sic] individuals with vision disabilities in reading, writing, and information management. I also learned from hardware and software manufacturers in this specialized industry how and when products best fit the varying needs of end users. In 1998, I began working for AccessAbility, which was one of the largest distributors of technology for the visually impaired.  I was a Training Manager at AccessAbility for five years; focusing on the way the products we manufactured should be taught to individuals with vision disabilities.  Several months after AccessAbility was purchased by PulseData/Humanware, I decided to open an assistive technology company with a colleague in 2002.  Our company, Adaptive Technology Services, provides one-on-one assessments for individuals with visual disabilities, computer system customization, assistive technology and computer training and trouble-shooting.  I am still operating this business today.

9.  I developed a course for the American Foundation for the Blind which trains assistive technology teachers.  I also co-taught a course at San Francisco State University for the Assistive Technology Track for Vocational Rehabilitation Counselor accreditation. I have published articles online related to the assistive technology field and on educating assistive software trainers.  I served as the

United States District Court
For the Northern District of California

1        NCBE has not disputed Rainey's expertise in its Opposition.  It did object to her

2   declaration at the time of the preliminary injunction.  NCBE's Objections to Evidence

3   Submitted by Plaintiff in support of Motion for Preliminary Injunction ("Objections") (dkt.

4   47) at 4-5.  NCBE argued Rainey did not have the requisite knowledge, skill, experience,

5   training or education to qualify as an expert on the matters on which she opined because she

6   is not a medical doctor, and did not review Ms. Enyart's medical records to obtain an

7   understanding of her functional impairments.[3]  Objections at 4.

8        This argument misses the point of the testimony.  The most effective assistive

9   technologies for accommodating Ms. Enyart's disability are not matters that require a

10  medical opinion, but rather, experience, skill, and knowledge with the use, application, and

11  evaluation of assistive technologies.  There is not a form of accreditation for the assistive

12  technology field, but Rainey has developed her expertise and knowledge base through fifteen

13  years of work experience as a consultant for individuals and organizations, on the specific

14  issues of what assistive technologies are most helpful to people in specific situations.  Rainey

15  Decl. ¶¶ 2, 6, 7.  Since 2002, she has operated her own assistive technology company that

16  provides one-one-one assessments dealing with this particular issue.  Id. ¶ 8.  Moreover,

17  Rainey described the principles and methods supporting her opinions as required by F.R.E.

18  702 by explaining the process of assistive technology assessments generally, and then

19  following that process with Ms. Enyart.  Rainey Decl. ¶¶ 12, 13, 15, 18.  The Court finds she

20  has the "technical, or other specialized knowledge [that] will assist the trier of fact to

21  understand the evidence or determine a fact in issue."[4]  F.R.E. 702. Thus, the Court finds

22  _____

23        Disability representative on the City of San Francisco Task Force on Technology.  I
          have presented on assistive technology issues at several local, state and national
24        conferences.

25  Rainey Decl. ¶¶ 6-9.

26        [3]  Since Rainey also suffers from Stargardt's disease, she is particularly familiar with its
     functional impairments.  Rainey Decl. ¶ 12.

27

28        [4]  The Court also finds the cases cited by NCBE in its Objections to be distinguishable.  Farely
     v. Gibson Container, Inc. involved a claim for discrimination that turned on whether the plaintiff had
     a "medically cognizable physical problem," and held the plaintiff had failed to establish a disability

United States District Court
For the Northern District of California

1    Rainey qualified as an expert, and finds her testimony regarding her evaluation of Ms. Enyart

2    admissible.

3          Rainey conducted an assessment of how Ms. Enyart used her impaired vision on

4    different test-taking tasks, such as reading, navigating within a document, making notes, and

5    writing.  Rainey Decl. ¶ 3.  Patricia Leetz, Ms. Enyart's Vocational Rehabilitation Counselor

6    with the California Department of Rehabilitation, who requested the assessment, asked

7    Rainey to provide her opinion of the most effective methods and tools Ms. Enyart should

8    utilize in performing these test-taking tasks.  Id.  After conducting this evaluation, Rainey

9    concluded that for the specific task of reading text on a standardized test, the accommodation

10   of both JAWS and ZoomText that Ms. Enyart was already using "was clearly the most

11   effective accommodation that would work for her."  Id. ¶ 18.  In addition, Ms. Enyart's

12   adapted reading system of JAWS and ZoomText is "clearly necessary for Ms. Enyart to

13   effectively function on a lengthy timed written exam."  Id. ¶ 15.  Rainey based her

14   conclusion on the following discussion and description of her assessment of Ms. Enyart.

15         For people without disabilities, the reading process typically becomes an automatic

16   physiologic and mental process.  Rainey Decl. ¶ 10.  A non-disabled reader can visually scan

17   a document and automatically decipher what he or she sees, without consciously expending

18   effort in receiving the information.  Id.  In a test-taking setting, a non-disabled person can

19   focus his or her mental efforts on the content of what is being read and determine the

20   appropriate response.  Id.  The reading process is not the same for many individuals with

21   visual disabilities.  Most people with visual disabilities develop their own system of

22   accommodated reading.  Id.  Often these alternative systems are related to or attempt to

23   replicate some of the automated characteristics of reading experienced by nondisabled

24   persons.  Id.  This is especially prevalent among people who lose vision after they learn to

25   read in the standard non-disabled manner.  Id.  In particular, high-functioning individuals

26

27   merely on his "say so."  891 F. Supp. 322, 324, 326 (N.D. Miss. 1995).  Here, it is not in dispute that
     Ms. Enyart is legally blind.  Hubbard v. Rite Aid Corp. similarly dealt with whether an expert was
28   specifically qualified to opine on whether the plaintiff was "disabled."  433 F. Supp. 2d 1150, 1161
     (S.D. Cal. 2006).  This is not at issue here.

United States District Court
For the Northern District of California

1   who are successful in colleges and professional schools almost always have developed a

2   methodology for receiving written information and comprehending it in a process that is

3   almost as automatic for them as it is for those without disabilities.  Id.

4          Rainey observed how Ms. Enyart reads on a personal computer running a combination

5   of JAWS and ZoomText.  Rainey Decl. ¶ 13.  Rainey found that it was not sufficient for Ms.

6   Enyart to just have the screen reader or the magnified formats on their own.  Id.  Since Ms.

7   Enyart has retained some vision, she has learned to compensate for her vision impairment by

8   using the limited vision that remains, through screen magnification, in conjunction with the

9   auditory input from the screen reading program.  Id.  Rainey stated this is not unusual, as

10   individuals who experience progressive vision loss often develop a reading process that

11   combines two assistive software applications in an effort to utilize their full capabilities.  Id.

12   She stated that "combining the use of Jaws and ZoomText enables individuals like Ms.

13   Enyart to function, as much as possible, as a sighted person functions when reading text."  Id.

14          Rainey's evaluation included an assessment of how fluent Ms. Enyart was with

15   navigating through a document using specific keyboard combinations in the software, and

16   how she used the available settings to best mitigate her eye strain from fatigue, light

17   sensitivity, and font size.  Rainey Decl. ¶¶ 14-16.  Rainey found that "[o]ne of the greatest

18   benefits of using ZoomText is that Ms. Enyart can use it to perform one of the most

19   exhausting functions required of visual reading with Retinal Dystrophy; the software pans

20   and tracks the text being read by the JAWS screen reader automatically.  The result is that

21   Ms. Enyart does not have to search for the beginning of each line of text she reads, the

22   adapted computer consistently handles this work no matter how long Ms. Enyart needs to

23   read.  Using any other magnified reading accommodation requires the user to visually

24   perform the tracking function.  Ms. Enyart's visual disability is exacerbated by trying to

25   perform visual tracking on her own which is why I cannot recommend any other

26   accommodation that needs to be performed for several hours in a row."  Rainey Decl. ¶ 16.

27   Thus, the evidence demonstrates the accommodation of JAWS and ZoomText "best ensures"

28   Ms. Enyart is focused on the content of the test and its test of her legal knowledge, rather

**United States District Court**
For the Northern District of California

1   than how well she works with a different accommodation.  NCBE fails to provide any expert

2   testimony that would contradict this conclusion.

3          This is supported by Rainey's examination of Ms. Enyart's use of other types of

4   accommodations, and her observation that they were not as successful.  Rainey Decl. ¶ 18,

5   20.  When questioned more specifically at her deposition, Rainey expanded that when

6   presented only with auditory input, Ms. Enyart was not as fluent with the material.  Levine

7   P.I. Decl. Ex. 56 (Rainey Dep. 112:13-17) (stating she could tell Ms. Enyart was less fluent

8   because Ms. Enyart "had to listen to the same information more than once; because she had

9   to slow down the speech.  Because I had to repeat myself a few times.  That when we work

10  on the computer, it was a different experience.").  Thus, Rainey determined that the

11  alternative accommodations offered would not be effective for Ms. Enyart.  Rainey Decl. ¶¶

12  19-23.

13         The elements NCBE alleges are disputed facts, such as whether Ms. Enyart can

14  process material from a solely auditory input, whether she has had a reader present at other

15  examinations and for other tasks, and whether her vision really has deteriorated, are not

16  material to any of the above conclusions that a combination of JAWS and ZoomText would

17  "best ensure" Ms. Enyart was truly accommodated on the MBE.  Those conclusions were

18  based upon Rainey's first-hand examination of Ms. Enyart.  Thus, the Court finds no dispute

19  of material fact as to the issues provided by Rainey, and that Rainey's testimony is sufficient

20  to grant summary judgment.

21                              ii.    Dr. Britton

22         Ms. Enyart presents the declaration of Bruce Britton in support of the motion for

23  summary judgment.  Britton Decl. (dkt. 142).  Dr. Britton is a Professor Emeritus of

24  Cognitive Psychology in the Department of Psychology at the University of Georgia.  Britton

25  Decl. ¶ 2.[5]  Dr. Britton's research is concerned with the process of reading and understanding

26  text, and he has published forty-nine articles in peer-reviewed journals and edited seven

27  _____

28        [5]  Dr. Britton has an M.S. in Science Writing from Boston University, and an M.A. and PhD in
      Psychology from the University of Iowa.  Before teaching at the University of Georgia for 28 years he
      taught at Coe College and Iowa State University.  Britton Decl. ¶ 2.

1    books in the area.  Id. ¶ 3.  He has been Principal Investigator on research grants and

2    contracts in this area awarded by the Defense Advanced Research Project Agency (DARPA),

3    the Office of Naval Research, and the Air Force Office of Scientific Research.  Id.  The

4    Defendant does not challenge Dr. Britton's qualifications or expertise in his area of specialty.

5    The Court finds Dr. Britton to be an expert whose testimony is admissible.

6            Dr. Britton conducted an in-person evaluation of Ms. Enyart in April 2011 to

7    determine the appropriate accommodations she requires to take the MBE.  Britton Decl. ¶ 5.

8    Dr. Britton stated he performed "a comprehensive, in-person evaluation of Ms. Enyart's

9    reading needs."  Id. ¶ 6.  This included asking her detailed questions about her vision and the

10   history of her visual impairment, and observing her while Ms. Enyart read using screen

11   access software on a computer, including reading and answering sample test items.  Id. ¶ 9.

12   Dr. Britton structured these sample test items as problem solving items composed of six

13   parts: a several-sentence description of a fact pattern, followed by a question about it, and

14   four possible answers.  Id.  He stated the answer choices were not simply memory

15   statements, which could be recalled or recognized as having been seen previously, but

16   required careful deliberation, including analysis and synthesis with the case description and

17   the question as stated.  Id.  The purpose of the questions was to require Ms. Enyart to engage

18   in problem solving, which tests working memory, the most conspicuous of cognitive

19   resources because it is a limited mental capacity.  Id.

20           Thus, Dr. Britton structured a test designed to engage and observe the specific skills

21   and qualities needed for an extended analytical test such as the MBE.  He then observed Ms.

22   Enyart's performance, and provided a detailed description of how the use of JAWS and

23   ZoomText allowed for the optimal utilization of the needed cognitive tools and skills.  See id.

24   ¶¶ 10-15 (stating, for example, that the problem solving items he created required a large

25   number "looking-backs" (called "regressions") at previously encountered elements of the

26   text, which elements are often separated from the element at which the regression starts by

27   many words, phrases or sentences; and that the JAWS and ZoomText software combination

28

allowed Ms. Enyart to make regressions by means of instantaneous keystrokes, albeit slower than the speed of full visual regressions).

Dr. Britton also provided a detailed explanation of why the other accommodations suggested by the NCBE do not provide the advantages he observed during his test of Ms. Enyart's use of the JAWS and ZoomText software.  Britton Decl. ¶¶ 17-27.  He then concluded that based on his observations, "the use of screen access software on the MBE and MPRE is the only accommodation that will 'best ensure' that Ms. Enyart's results on those examinations will accurately reflect her aptitude rather than her disability."  Id. ¶ 29.

NCBE argues that the validity of Dr. Britton's opinion is a disputed fact.  Opp'n at 12-13.  It argues Dr. Britton's opinions "are based, in large part, on Mr. Britton's mere repetition of the opinions Ms. Enyart expressed to him as to the accommodations that 'best ensure' the MBE measures her abilities, as well as his reliance on Ms. Enyart's representations as to her prior use of the accommodations available to her on the MBE . . . ."  Opp'n at 12.  Thus, NCBE argues the record calls into question the validity of Dr. Britton's opinion.  This argument is not supported by the record.

NCBE argues Dr. Britton's opinion is unreliable because NCBE says it is based "in large part" on repetition of Ms. Enyart's own opinions and statements about her prior use of accommodations, the validity of which NCBE argues is a disputed fact.  Opp'n at 12.  To support this statement, NCBE cites to a portion of Dr. Britton's deposition.  Yet, the actual text of the deposition demonstrates that when Dr. Britton was asked to what extent the opinion he has formed in the case relies upon the accuracy of the information provided to him by Ms. Enyart, he replied, "To some extent."  Terlouw Decl. Ex. G (dkt. 155-7) (Britton Dep. at 61:8-11).  "To some extent" is simply not the same as "in large part."  That Dr. Britton's opinion is based to some extent on the accuracy of Ms. Enyart's representations is not surprising.  As discussed below, the Court does not agree that the alleged issues regarding Ms. Enyart's prior use of accommodations are relevant disputed issues of material fact.  Moreover, and most importantly, NCBE's argument ignores that Dr. Britton examined Ms. Enyart first-hand, and explained how his recommendations related to the elements of this

14

United States District Court
For the Northern District of California

1    examination.  Britton Decl. ¶¶ 17-27.  Finally, NCBE points to no citation or evidence to

2    support challenging a doctor's testimony on the basis that it relies in part on a patient's self

3    report.  Thus, the Court finds there is no dispute of fact as to the validity of Dr. Britton's

4    opinion, and that Dr. Britton's opinion supports granting summary judgment.

5                               iii.    Dr. Schroeder

6          Ms. Enyart presents the declaration of Frederic K. Schroeder in support of her motion

7    for summary judgment.  Schroeder Decl. (dkt. 143).  Dr. Schroeder is a Research Professor at

8    San Diego State University, where he is responsible for developing curricula in the area of

9    rehabilitation administration leadership and policy development.[6]  Schroeder Decl. ¶ 1.  Dr.

10   Schroeder has served as a statewide coordinator for services of the blind, and in 1994, was

11   appointed by President Clinton and confirmed by the Senate to serve as Commissioner of the

12   Rehabilitation Services Administration for the U.S. Department of Education.  Schroeder

13   Decl. ¶¶ 3-5.  He served as Commissioner until 2001, serving as principal officer of the

14   federal agency authorized to carry out specific portions of the Rehabilitation Act of 1973, as

15   amended; the Randolph-Sheppard Act, as amended; and the Helen Keller Act.  Id. ¶ 3.  He

16   provided executive leadership to the Rehabilitation Services Administration, establishing

17   goals and objectives for serving individuals with disabilities, and developed standards,

18   criteria, guidelines, and policies to provide direction in the administration of agency

19   programs.  Id.  He is blind.  Id. ¶ 10.

20         Defendant does not challenge Dr. Schroeder's qualifications per se, but challenges his

21   credibility.  Opp'n at 13-14.  Dr. Schroeder has been affiliated with the National Federation

22   of the Blind ("NFB") for many years.  He served as a member of the NFB's Board of

23   Directors from 1984 to 1994, was reelected in 2001, and was elected vice-president in 2005,

24   a position he still holds.  Terlouw Decl. Ex. H (Schroeder Dep. at 30:4-14, 40:5-41:17).

25

26

27         [6]  Dr. Schroeder has a Bachelor's degree in Psychology from San Francisco State University,
     a Master of Arts in Special Education of the Physically Handicapped and Visually Handicapped from
28   San Francisco State University, and a PhD in Education Administration and Supervision from the
     University of New Mexico.

**United States District Court**
For the Northern District of California

1      Dr. Schroeder testified at his deposition that the NFB's mission is "to serve as a

2   means of collective action" for blind individuals, including the support of litigation.  Id. at

3   62:9-63:5.  Dr. Schroeder also answered in the affirmative when asked if the NFB supported

4   all of the lawsuits that have been brought against the NCBE by visually impaired examinees.

5   Id. at 68:9-15.  NCBE argues summary judgment is inappropriate because the record shows

6   Dr. Schroeder has a vested personal interest in Ms. Enyart's case that is strongly suggestive

7   of bias, which calls into question his credibility.  Opp'n at 14.

8      Ms. Enyart does not provide a substantive response: "NCBE's further suggestion that

9   Dr. Schroeder would perjure himself because of an affiliation with the National Federation

10  for the Blind (NFB), an entity that is not even a party to this case, is speculation not worth

11  dignifying with a substantive response."  Reply at 8.  Although it is likely true Dr. Schroeder

12  would not commit perjury simply due to his position in the NFB, that does not necessarily

13  demonstrate that there would not be some even unconscious bias given the organization's

14  stated and active support for exactly this type of litigation.

15     As a general rule, bias is not a permissible reason for the exclusion of expert

16  testimony.  United States v. Abonce-Barrera, 257 F.3d 959, 965 (9th Cir. 2001) (stating

17  "evidence of bias goes toward credibility of a witness, not his competency to testify and

18  credibility is an issue for the jury" and finding that since defendant had opportunity to cross-

19  examine witness fully about bias, there was no error in allowing the testimony).  Thus, it is

20  not in error for this Court to allow the testimony and take credibility issues into account.

21  Yet, given the paucity of information offered by both sides on this issue, the Court chooses

22  not to do so at this time.  The testimony of Rainey and Dr. Britton is sufficient to support

23  granting summary judgment without consideration of Dr. Schroeder's testimony.

24                          iv.    Dr. Sarraf

25     Dr. Sarraf is a physician and Associate Professor of Ophthalmology, Rentinal

26  Disorders and Ophthalmic Genetics.  Levine First P.I. Decl. Ex. 26 at N0033.  NCBE

27  challenges the validity of Dr. Sarraf's opinions as to Ms. Enyart's need for certain

28  accommodations as a disputed fact.  In her Motion for Summary Judgment, Ms. Enyart

stated: "In each instance [of requesting an accommodation], Ms. Enyart supplied supporting documentation from her vocational rehabilitation counselor, treating ophthalmologist, law school dean and assistive technology specialist, each of whom documented her need to use JAWS and ZoomText to access test information."  Mot. at 5.  The footnote at the end of the sentence cites to Levine First P.I. Decl. Exs. 1, 3, 14-16, 18-19, 22, 23, 25-30, 35, 38, 39-40, 42, 46, and 47-53.  Of those, Exhibit 26 ("Form B, Testing Accommodations – Physical Disability") was signed by Dr. Sarraf.

NCBE does not challenge Dr. Sarraf's credentials as an ophthalmologist.  Rather, it argues that Dr. Sarraf confirmed at his deposition that Ms. Enyart wrote the responses to the questions on the Testing Accommodations Form and he signed the form without revisions, and thus, the validity of his opinion is a disputed fact.  Opp'n at 11-12, citing Terlouw Decl. Ex. I (Sarraf Dep. at 52:11-24, 54:17-55:3).

Ms. Enyart replies that in her motion she relies upon Dr. Sarraf only with respect to (i) whether she suffers from macular degeneration and retinal dystrophy, with a likely diagnosis of Stargardt's Disease; and (ii) that she is legally blind.  Reply at 8-9, citing to Mot. at 2-3, 15 (citing Levine First P.I. Decl. Exs. 12, 26).  Ms. Enyart states she relies on other evidence, such as the Rainey and Britton declarations, to support her need for particular accommodations.  Reply at 9.  While this is true, Ms. Enyart does ignore the citation from NCBE's Opposition.  Still, that citation included the report signed by Dr. Sarraf as only one of over 25 cited exhibits.

Even if NCBE's claim is valid, Ms. Enyart is correct when she states: "The only issue requiring ophthalmological evidence are the facts regarding Ms. Enyart's current diagnosis and visual acuity.  These are relevant to support her wholly undisputed status as a person with a disability."  Reply at 9.  This is the material fact regarding evidence provided by Dr. Sarraf.  Ms. Enyart's current primary reading method due to her visual disability rests on other evidence, which, as discussed above, is not subject to genuine dispute.  Thus, the Court finds no dispute over material facts with regard to Dr. Sarraf.

United States District Court
For the Northern District of California

### 4.     Other Evidence

NCBE claims there are several other disputes over material facts: (1) whether the accommodations offered to Ms. Enyart "best ensure" the MBE measures her abilities; (2) the extent of Ms. Enyart's prior use of accommodations offered to her for the MBE; (3) whether Ms. Enyart's vision has deteriorated and thus, whether accommodations used in the past are still effective; (4) whether Ms. Enyart needs simultaneous auditory and visual input; and (5) whether accommodations sought by Ms. Enyart are actually effective for her.  These claims all essentially boil down to whether or not the fact that Ms. Enyart has previously used other types of accommodations with varying levels of success creates a genuine issue of material fact as to whether ZoomText and JAWS would "best ensure" her performance on the MBE reflects her legal knowledge rather than her disability.  NCBE frames this argument in different ways, but all these arguments center on whether the fact that Ms. Enyart may have used other accommodations in the past with some measure of success creates a disputed issue as to the material facts regarding what accommodations "best ensure" her performance on the MBE reflects her legal knowledge.

#### a.     "Best Ensure"

NCBE's first argument – that there is a dispute about whether her requested accommodations "best ensure" that Ms. Enyart's impairment does not affect her performance on the MBE – is based entirely on Ms. Enyart's use of other types of accommodations in previous testing scenarios.  Opp'n at 3-5 (discussing Ms. Enyart's use of readers and audiotapes during her undergraduate career, during her LSAT preparation, and in law school, and the types of accommodations she received for taking the Advanced Placement tests and the LSAT).  Given that Ms. Enyart has provided persuasive expert testimony addressing the "best ensure" standard, while NCBE has failed to do so, this prior use of accommodations is not a material fact.  Moreover, as discussed below, NCBE's characterization of these facts is incomplete.

**United States District Court**
For the Northern District of California

1    <u>b.</u>    <u>Prior Use of Accommodations</u>

2    Ms. Enyart's prior use of accommodations more generally also does not create a

3    genuine issue of material fact as to what accommodations would "best ensure" her

4    performance on the MBE.

5    First, the evidence NCBE points to does not actually imply everything NCBE states it

6    does.  NCBE makes much of the evidence in the record demonstrating Ms. Enyart had

7    readers present at many of her law school exams.  Yet, Ms. Enyart herself states she used

8    readers in prior exams – to help with ancillary tasks.  For example, in her deposition Ms.

9    Enyart stated that in law school "most of the time [she] had a reader on hand during

10   examinations, and that reader was bubbling answers and . . . reading the time that [they]

11   started, how many minutes were left."  Terlouw Decl. Ex. A (Enyart Dep. 35:14-17).  Ms.

12   Enyart also testified she used readers a few times on essay questions: "They would read an

13   initial pass, or the first look at a passage.  In all of those instances it was followed up by my

14   careful review of that question or test material, with the software combination of JAWS and

15   ZoomText, and my own notation system."  <u>Id.</u> (Enyart Dep. 35:22-36:4).  Moreover, Ms.

16   Enyart does not deny that during initial bar preparation she used readers authorized by the

17   Department of Rehabilitation.  She used them "to help her organize the . . . material provided

18   by the test preparation company and to complete the relevant paperwork for getting

19   accommodations for different exams . . . ."  <u>Id.</u> (Enyart Dep. 47:7-48:11).  This is not the

20   same as the proposed accommodation of a reader as the <u>primary</u> method of receiving test

21   information on a timed, closed book, multiple choice exam.  Thus, even if the prior use of

22   accommodations generally was in dispute, it is not material.

23   This is also apparent with the discussion of Ms. Enyart's use of a CCTV.  NCBE

24   argues Ms. Enyart's statements regarding her inability to use a CCTV to read for extended

25   periods of time are undermined by her request that the Department of Rehabilitation purchase

26   a CCTV for her use.  Opp'n at 9.  Ms. Enyart's statements demonstrate she uses the CCTV

27   for tasks which are very different from the prolonged reading of an examination.  For

28   example, she uses the CCTV for small tasks such as reading a price tag, distinguishing

1   between different denominations of paper money, seeing a label on clothes, looking at the

2   side of a medicine bottle, writing a check, or reading short instructions.  See Rainey Decl. ¶

3   20; Enyart P.I. Decl. ¶ 7.  The ability to quickly read small pieces of text is important to Ms.

4   Enyart's ease of functioning in the everyday environment, including in her studies.  This is

5   demonstrated by its stated importance to her in the Department of Rehabilitation

6   authorization for its purchase cited by NCBE, but that does not make it a disputed fact that it

7   is an appropriate accommodation for an extended test such as the MBE.[7]  NCBE presents no

8   evidence that would demonstrate its appropriateness for such a task.

9        Second, the information is simply not material under the "best ensure" standard.  That

10  Ms. Enyart can use certain technology does not mean it is the most appropriate technology

11  for a given situation.  Ms. Enyart's use of readers for periphery tasks during test preparation

12  and during examinations does not mean they are appropriate as her primary method of

13  receiving auditory information to "best ensure" she is tested on her legal knowledge.  The

14  expert testimony regarding the "best ensure" standard demonstrates her requested

15  accommodations are what would "best ensure" her performance.  Her prior use of readers is

16  not material to that determination.

17                        c.        Deterioration of Vision

18       It appears that there is a dispute of fact over whether Ms. Enyart's vision has

19  deteriorated.  Compare Enyart Decl. ¶ 15 (stating her "vision has deteriorated over the

20  years") with Terlouw Decl. Ex. F (Dr. Sarraf Dep. 33:22-24) ("Overall we would argue

21  relatively stable vision over the last seven years.").  The Court finds this dispute is not over a

22  material fact.  That Ms. Enyart's vision may or may not have declined is not material to the

23  _____

24       [7]  The authorization from the California Department of Rehabilitation states the CCTV allows
     Ms. Enyart to read and write documented materials up to 150x the normal size, that she uses it
25   voraciously, and that she uses to read and write, tasks essential for a law student and for preparing for
     the bar. Terlouw Decl. Ex. C at D 0016-17, 0070-71, 0127.  This is a rather broad statement that should
26   be taken in context.  It does not address a testing situation.  It does not create a genuine issue of material
     fact because Ms. Enyart's deposition testimony, declarations, and the other declarations demonstrate
27   that she does use the CCTV to read and write, just in a limited way.  This use is not precluded by the
     statements in the authorization; the statements in the authorization are more general.  In addition, the
28   ability to quickly read and write small amounts of text is central to the ability to function effectively as
     a student day to day, but not to the taking of a test such as the MBE.

                                    20

**United States District Court**
For the Northern District of California

1  accepted evaluation of Rainey, and her testimony that Ms. Enyart's preferred

2  accommodations "best ensure" that Ms. Enyart will be tested on her legal ability rather than

3  her ability to adapt to certain accommodations.

4       In addition, NCBE makes this argument in support of its contention that

5  accommodations Ms. Enyart has used previously are still viable today because her vision has

6  not deteriorated.  Yet, this ignores completely the advances in assistive technology over time.

7  These changes also affect which type of accommodation meets the "best ensure" standard.

8                    d.      Simultaneous Visual and Auditory Input

9       NCBE argues there is a dispute of material fact over whether Ms. Enyart needs

10  simultaneous visual and auditory input to "best ensure" her performance on the MBE.  Opp'n

11  at 16-17.  To support this contention, NCBE point to a <u>draft</u> version of Ms. Enyart's law

12  school application personal statement and a single email in which she indicates she is able to

13  understand text when only given auditory input.  Terlouw Decl. Ex. B at P 002079 (which

14  states Ms. Enyart still benefits "from magnification software on my computer"); <u>Id.</u> at P

15  000649 (stating she has solid skills in auditory-only processing).  First, as the texts show,

16  these documents do not demonstrate Ms. Enyart does not need both auditory and visual input

17  to best comprehend material.  In fact, they demonstrate she benefits from magnification

18  software.  Thus, they do not create a dispute of material fact.

19       Second, NCBE's own expert, along with Ms. Enyart's experts, stated Ms. Enyart

20  requires both auditory and visual input to process the examination successfully.  Levine P.I.

21  Decl. Ex. 58 (Damari Dep. 9:5-15 (stating agreement that it would be appropriate for Ms.

22  Enyart to have both auditory and visual input on the exam and giving clinical reasoning and

23  explanation), 29:21-24 (no reason to disbelieve claim that Ms. Enyart needs both auditory

24  and visual input for prolonged reading), 81:16-19 (stating that even a reasonable

25  accommodation would include both auditory and visual input)).  Therefore, there is no

26  dispute of fact on this issue.

27

28

21

e.      Effectiveness of Requested Accommodations

Finally, NCBE attempts to create a disputed fact based on Ms. Enyart's failure to pass the MBE to this point.  NCBE argues it is a disputed fact whether Ms. Enyart's requested accommodations are really effective for her given her past success with other accommodations and her failure on the MBE to date.  Opp'n at 14-16.  First, this ignores the fact that Ms. Enyart has passed the MPRE with her requested accommodations.  Second, this is a restatement of the previous arguments regarding use of prior accommodations, and the stated arguments above apply equally here.  Third, that Ms. Enyart has not passed the MBE at this point with JAWS and ZoomText does not provide a dispute that the accommodation "best ensures" she is tested on her legal knowledge.  It is simply speculation.  It could also mean Ms. Enyart simply was not prepared to pass the exam.  The expert testimony supports finding JAWS and ZoomText "best ensure" she is tested on her knowledge.  Her failures so far do not change this calculation.  Thus, the Court finds there is not a genuine dispute over material facts.

## 5.      The Accommodations are not an Undue Burden

A private entity shall provide the appropriate auxiliary aid "unless that private entity can demonstrate that offering a particular auxiliary aid . . . would result in an undue burden." 28 C.F.R. § 36.309(b)(3).  The regulations define undue burden as follows:

> Undue burden means significant difficulty or expense. In determining whether an action would result in an undue burden, factors to be considered include–
>
> (1) The nature and cost of the action needed under this part;
>
> (2) The overall financial resources of the site or sites involved in the action; the number of persons employed at the site; the effect on expenses and resources; legitimate safety requirements that are necessary for safe operation, including crime prevention measures; or the impact otherwise of the action upon the operation of the site;
>
> (3) The geographic separateness, and the administrative or fiscal relationship of the site or sites in question to any parent corporation or entity;
>
> (4) If applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; the number, type, and location of its facilities; and

United States District Court
For the Northern District of California

1    (5) If applicable, the type of operation or operations of any parent corporation
     or entity, including the composition, structure, and functions of the workforce
2    of the parent corporation or entity.

3    28 C.F.R. § 36.104.  NCBE argues providing Ms. Enyart with JAWS and ZoomText would

4    impose an undue burden under the above factors.  While it is true that accommodating Ms.

5    Enyart will not be effortless, it does not rise to the level of an undue burden.

6          NCBE argues first that accommodating Ms. Enyart would impose an undue financial

7    burden.  Opp'n at 18-19.  NCBE estimates the cost of accommodating JAWS and ZoomText

8    at $5,000 on average per examinee per exam, largely because its security concerns lead it to

9    provide a computer to an examinee, rather than loading the exam on an examinee's

10   computer.  Terlouw Decl. Ex. J (Moeser Decl. ¶ 12(a)).  Then NCBE states that the state

11   boards of bar examiners are responsible for these costs under NCBE's current policy.  Opp'n

12   at 19.  Thus, this is not an actual financial burden on NCBE.  NCBE continues that, in

13   actuality, the cost of accommodating Ms. Enyart has been $6,542 per exam.  Terlouw Decl.

14   Ex. I (NBE Interrogatory Responses at 20).  NCBE states that under their own policy they are

15   then responsible for any additional costs over $5,000.  Opp'n at 19.  NCBE points to no

16   reason why it could not have a policy of passing on the entire cost of accommodations to the

17   state boards; or alternatively, why NCBE could not incorporate the cost into the price per

18   MBE examinee that it charges to state jurisdictions (currently stated to be $54 per examinee),

19   so as to spread out the cost and not cause a burden to any particular jurisdiction.  The burden

20   to jurisdictions though, is simply not an undue burden on NCBE.  NCBE's slippery slope

21   argument is also not convincing, as the financial burden of even many accommodations is

22   borne in great part by parties other than NCBE, and there is no stated reason for NCBE to

23   bear the burden at all.

24         NCBE also fails to demonstrate an undue administrative burden.  NCBE argues that it

25   takes approximately 78 hours of NCBE staff time to complete the multi-step process of

26   setting up an accessible laptop for a single administration of the MBE to a single examinee,

27   and that the process took additional time for Ms. Enyart.  Terlouw Decl. Ex. I (NCBE

28   Interrogatory Responses at 5, 11).  NCBE also argues that the administrative burden is

1    increased because Ms. Enyart's demands keep changing: she has asked for the ability to

2    change the font and text size of the exam, different software versions, extra set up time, and

3    technical assistance.  Opp'n at 20.  It states that in the ordinary course of business, NCBE is

4    not involved in administering the MBE to examinees.  Terlouw Decl. Ex. J (Moeser Decl. ¶

5    4©)).  Rather, the state boards of bar examiners purchase the MBE from NCBE and

6    administer the MBE.  <u>Id.</u>  Thus, NCBE states it "is simply not equipped to devote the staff

7    time and financial resources necessary to make the MBE available on an NCBE-provided

8    computer in a manner that satisfies the idiosyncratic software preferences and other

9    specifications of each examinee, and then devote extensive staff time to assisting in the

10   administration of the exam."  Opp'n at 22.

11         Yet, as Ms. Enyart points out, NCBE provides no evidence of how these staff hours

12   would be unduly burdensome compared to NCBE's total staff and any ability to contract out

13   some of the work to assistive technology vendors.  NCBE does not point to evidence of its

14   staff size, or work allocation that demonstrates this amount of time constitutes an undue

15   burden.  Further, NCBE should not double-count its staff time, which it presumably includes

16   in the $5,000 average charge to the state boards of examiners for the MBE.  It is clear that

17   accommodating Ms. Enyart causes some administrative burden.  Yet, NCBE's statements,

18   unsupported by specific evidence, that this creates an <u>undue</u> administrative burden are

19   unconvincing.

20         Even the case law cited by NCBE appears to demonstrate that it has not shown an

21   undue administrative burden here.  For example, in <u>Barth v. Gelb</u>, 2 F.3d 1180 (D.C. Cir.

22   1993), the Court determined that Voice of America (VOA) was not required to accommodate

23   a potential applicant for an overseas radio engineering specialist position because of the

24   undue hardship on the organization.  The plaintiff was a severe diabetic, and could only

25   safely be assigned to posts with adequate medical facilities.  <u>Id.</u> at 1187.  VOA had twelve

26   far-flung radio relay stations, most of them "hardship posts" among which it rotated its small

27   number of radio engineering specialists.  <u>Id.</u> at 1188.  The non-hardship posts, the only ones

28   at which the plaintiff would be eligible to serve, "function[ed] as short-term havens for its

1  specialists." Id.  The Court found that keeping plaintiff at a non-hardship post, thus

2  preventing a rotation to that non-hardship post for someone on a short-term leave, would

3  impose additional burdens on the remaining engineers, and would greatly compound VOA's

4  staffing problems.  Id.  The Court found VOA had "introduced sufficient evidence to support

5  a claim of undue hardship by virtue of the loss of essential operational flexibility that would

6  have resulted from an attempt to accommodate [plaintiff's] medical needs." Id. at 1189.

7  That is simply not the case here.  NCBE has not presented evidence of an administrative

8  hardship analogous to Barth or rising close to that level of complication.

9       Other cases finding undue burden demonstrate it is a high bar.  For example, in

10  Roberts v. KinderCare Learning Centers, Inc., 896 F. Supp. 921 (D. Minn. 1995), the Court

11  found accommodating a child's disability at a daycare center would cause an undue burden.

12  Looking at the evidence, the Court found KinderCare would need to hire a full-time

13  employee to accommodate the child's disability, at a cost of approximately $200 per week,

14  plus benefits, while receiving $105 per week in tuition for the child's care.  Id. at 927.  It was

15  undisputed that KinderCare operated "on a shoestring budget," and plaintiff offered no

16  evidence contrary to trial testimony indicating that the $95 per week loss would constitute a

17  substantial financial detriment to the site, which had recently emerged from bankruptcy.  Id.

18  Moreover, the Court rejected the argument that KinderCare could simply transfer the center's

19  director or some other staff member to provide the one-on-one care without any cost based

20  on specific testimony from the director as to her overwhelming workload and lack of extra

21  staff members.  Id.  Thus, the Court found that requiring KinderCare to accommodate the

22  child's disability would impose an undue financial or administrative burden on KinderCare.

23  Id.  NCBE has not pointed to the evidence that the monetary funds required here would

24  constitute "substantial financial detriment," nor provided specific evidence as to why the

25  extra needed staff hours would be an undue administrative burden.  Thus, NCBE has failed to

26  demonstrate an undue burden in this case.

27

28

### 6.      Other ADA Elements

Ms. Enyart has satisfied the other elements of a claim under the ADA.  It is undisputed that Ms. Enyart, who is legally blind, is a qualified individual with disabilities within the meaning of 42 U.S.C. § 12102(2) and 28 C.F.R. § 36.104, as she has a physical impairment that substantially limits one or more of her major life activities.  Enyart Decl. ¶ 6 (legal blindness).  It is also not disputed that NCBE is a private testing entity covered by Section 12189.  The DOJ has advised that the regulation implementing Section 12189 "applies to any private entity that offers the specified types of examinations or courses." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544 (July 26, 1991).  Thus, the other elements of the claim are met.

### C.      The Unruh Claim

The Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51 *et seq.*, guarantees that all persons within California, "no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).  The Unruh Act states, and the courts have recognized, that a violation of the ADA is, per se, a violation of the Unruh Act.  Cal. Civ. Code § 51(f); <u>Lentini v. Cal. Ctr. for the Arts</u>, 370 F.3d 837, 847 (9th Cir. 2004).  Thus, since NCBE has violated the ADA, it has also violated the Unruh Act.

### D.      Declaratory and Injunctive Relief

Both the ADA and the Unruh Act authorize injunctive relief as a remedy for their violation.  42 U.S.C. § 12188 (ADA); Cal. Civ. Code § 52(c)(3) (Unruh Act).  The Ninth Circuit has stated that "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute [such as the ADA] which specifically provides for injunctive relief."  <u>Silver Sage Partners, Ltd. v. City of Desert Hot Springs</u>, 251 F.3d 814, 827 (9th Cir. 2001) (internal quotations and citations omitted). Here, since Ms. Enyart has proven her ADA Title III claim, and because Title III specifically

authorizes injunctive relief as a remedy for its violation and does not provide for monetary damages, the Court grants permanent injunctive relief.  See also Antoninetti v. Chipotle Mexican Grill, Inc., 643 F.3d 1165, 1175 (9th Cir. 2010) ("Considering all the circumstances, including particularly the statutory violations we have found and the fact that an injunction is the only relief available to a private party under the [Americans with Disabilities] Act, it would be an abuse of discretion for the district court now to deny injunctive relief.").

**IV.   CONCLUSION**

For the foregoing reasons, the Court GRANTS the Motion for Summary Judgment. The Court finds as a matter of law that NCBE has violated the ADA and the Unruh Act by refusing to provide Ms. Enyart with her requested accommodations of screen access software on the MBE and the MPRE, and that with respect to the MBE, these violations are ongoing. Therefore, the Court ORDERS as follows:

1.     NCBE is required to provide the accommodation of screen reading and screen magnification software to Ms. Enyart on any future administration of the MBE that Ms. Enyart may have to take, consistent with the terms of the preliminary injunctions previously granted by the Court in this action.

2.     Upon entry of judgment for Ms. Enyart, the two bonds previously entered with this Court shall be dissolved, and Ms. Enyart's cash collateral returned to her.

**IT IS SO ORDERED.**

Dated: October 24, 2011

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California